**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, THE NAACP TEXAS STATE CONFERENCE, THE TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS,<br>*Plaintiffs*<br><br>v.<br><br>ROBERT S. HOWDEN, IN HIS OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE; AND FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE TEXAS DEPARTMENT OF PUBLIC SAFETY;<br>*Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. SA-26-CV-06867-XR |

**<u>ORDER DISMISSING COMPLAINT WITHOUT PREJUDICE</u>**

On this date, the Court considered the status of this case and Plaintiffs' motions for summary judgment (ECF No. 2), for a preliminary injunction (ECF No. 3), and for expedited briefing (ECF No. 4). After careful consideration of Plaintiffs' filings and its own subject matter jurisdiction, Plaintiffs' complaint (ECF No. 1) is **DISMISSED WITHOUT PREJUDICE** for lack of standing and their motions for relief (ECF Nos. 2–4) are **DENIED AS MOOT**, for the reasons stated herein.

**BACKGROUND**

Plaintiffs the National Association for the Advancement of Colored People (NAACP), The NAACP Texas State Conference (NAACP Texas), and The Texas League of United Latin American Citizens (LULAC) filed their Complaint (ECF No. 1) seeking a declaration that the Texas Secretary of State (the Secretary) and Director of the Texas Department of Public Safety

(DPS) have violated the public disclosure provision of the National Voter Registration Act (NVRA), 52 U.S.C. § 20507(i), by failing to provide access to certain registration records and injunctive relief ordering Defendants to produce the requested records.

The NVRA is designed to "increase the number of eligible citizens who register to vote" and "enhance[ ] the participation of eligible citizens as voters" in federal elections. 52 U.S.C. § 20501(b)(1)–(2). It is also intended to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(3)–(4). In service of those interests, the NRVA contains a public disclosure requirement:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

*Id.* § 20507(i)(1). "A person who is aggrieved by a violation of [the NVRA] may provide written notice of the violation to the chief election official of the State involved" and may file suit for injunctive relief if the violation goes uncorrected. *Id.* § 20510(b)(1)–(2).

Plaintiffs are seeking access to records from the Secretary and DPS based on public reports of registration application backlogs affecting thousands of Texans in the lead-up to the 2026 midterm elections. In Texas, the Secretary, in coordination with DPS, is responsible for collecting voter registration applications submitted as part of driver license applications or changes of address. The Secretary then transmits them to counties for processing. ECF No. 1 ¶ 20. According to the complaint, on September 22, 2026, Defendants informed county election officials that DPS had identified voter registration records arising from online DPS transactions that were incomplete and that, as a result, such records had not been transmitted to the counties for review. *Id.* By

October 1, 2026, more than 500,000 backlogged registration applications had been transmitted to counties for processing. *Id.* The Secretary reported on October 15, 2026, that the backlog had been fully processed by counties. *Id.* On October 16, 2026, however, the Secretary reported that a different technical error had resulted in a new backlog of 15,000 registrations. *Id.* Plaintiffs allege "[o]n information and belief" that their members include individuals whose voter registration applications or updates were among the more than 500,000 qualifying DPS transactions that Defendants did not timely transmit to county election officials." ECF No. 1 at 2.

Plaintiffs sent a request for information to the Secretary on October 8, 2026, seeking: (1) DPS voter registration transaction records for the previous two years, (2) technical and procedural records necessary to interpret the production, and (3) records concerning the identification and remediation of delayed DPS voter registration transactions. ECF No. 1-2 at 2–3. To avoid disclosure of protected voter information protected from public disclosure Plaintiffs agreed to accept a pseudonymized electronic extract from the relevant records systems. *Id.* at 2–3.

The Secretary responded on October 23, 2026, stating that an estimate of costs for producing the records would be provided by November 6, 2026. ECF No. 1 at 10; ECF No. 1-3 at 3. Plaintiffs alleged that Defendants' failure to produce the requested records before Election Day on November 3, 2026, "impair[ed]" Plaintiffs' voter registration, voter education, get-out-the-vote, and election protection activities and "hampered" their ability to determine the extent of the State's voter registration transaction issues, assess the State's remediation efforts, determine which voters were affected, advise affected voters, and decide how to deploy resources. ECF No. 1 at 3.

Plaintiffs ask the Court to enter summary judgment declaring Defendants in violation of 52 U.S.C. § 20507(i), ECF No. 2 at 20, and to issue a preliminary injunction ordering Defendants

to produce the requested records, ECF No. 3 at 13. In support of these requests, Plaintiffs have provided three declarations describing how they intend to use the DPS records:

- The NAACP "intend[s] to use the requested records to ascertain the nature, existence, and scope of the reported problems, including their geographic distribution, so that the NAACP can better tailor its voter outreach and election protection efforts" and "determine . . . whether the acknowledged problems have been fully resolved, where additional failures may remain, or where our existing voter-assistance operations should focus their limited time" without the requested records. ECF No. 2-2, Decl. of Tyler Sterling ¶¶ 8–9.

- NAACP Texas intends "to use those records to determine whether processing problems remain, their nature and extent, and where in Texas they are concentrated" to "help the Texas NAACP tailor the voter-registration information, outreach, and protection work," lest the organization "be greatly impaired in implementing [its] desire to reliably distinguish a problem that has been resolved from one that may still be affecting particular counties or registration transactions." *Id.*, Decl. of Gary Bledsoe ¶ 9.

- LULAC intends use the requested records to determine the nature and scope of any processing problems and "evaluate whether announced fixes addressed all relevant transactions or determine which communities, if any, should be priorities for existing voter-education efforts." *Id.*, Decl. of Gabriel Yaotequia Rosales ¶ 8.

Because Plaintiffs have failed to adequately allege particular downstream consequences for Defendants' failure to disclose the requested information, the Court will dismiss Plaintiffs' complaint for lack of standing and deny their pending motions as moot.

**DISCUSSION**

**I. Legal Standard**

A court has a duty to examine its subject matter jurisdiction and must do so *sua sponte* when necessary. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 919 (5th Cir. 2001); *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 820 (5th Cir. 2022) (Federal courts "have an independent obligation to assure that standing exists.") (citation and quotation omitted). Standing "is a component of subject matter jurisdiction." *HSBC Bank USA, N.A. as Tr. for Merrill Lynch Mortg. Loan v. Crum*, 907 F.3d 199, 202 (5th Cir. 2018). Neither a preliminary injunction nor a

final relief may be requested by plaintiffs who lack standing. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020).

Standing requires that plaintiffs "(1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Id.* at 330 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560−61 (1992)). An injury in fact is "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation modified).

A plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at 341. Rather, "standing requires a concrete injury even in the context of a statutory violation." *Id.*; *see also Perez*, 45 F.4th at 823 (holding the same notwithstanding "whether a statutory right is procedural or substantive").

**II. Analysis**

Generally, an informational injury in law is not an injury in fact; plaintiffs must offer "meaningful evidence regarding any downstream consequences." *See Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 936–37 (5th Cir. 2022); *but see Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20–25 (1998) (confirming that a group of voters' "inability to obtain information" that Congress had decided to make public is a sufficient injury in fact to satisfy Article III). "[I]n public disclosure-based cases, plaintiffs must and can assert 'downstream consequences,' which is another way of identifying concrete harm from governmental failures to disclose." *Campaign Legal Center, 49 F. 4th* at 938.

In *Campaign Legal Center*, the Fifth Circuit held that plaintiffs, civic engagement organizations, lacked standing to bring suit under the NVRA's public-disclosure provision seeking information about persons suspected of being noncitizens who were registered to vote. *Id.* at 932–33. The plaintiffs argued that they had standing to request public records in their capacity as civic engagement organizations and that there were downstream injuries "with respect to the public" arising from the lack of visibility into "how Texas is keeping its voter lists" and the potential for discrimination and burdens on properly registered Texans' right to vote. Reversing the district court's injunction, the panel rejected these alleged downstream consequences, which "encompass[ed] no more than alleged injuries to *the public* and *affected Texas voters* writ large." *Id.* at 936 (emphasis in original).

The court dismissed "the district court's concern about [the p]laintiffs' lack of 'opportunity' to identify voters incorrectly described by the Secretary's data base [sic]" as "speculative rather than concrete." *Id.* at 937. "The lack of concrete harm . . [was] reinforced because not a single [p]laintiff [was] a Texas voter, much less a voter wrongfully identified as ineligible, and the [p]laintiffs [did] not claim[] organizational standing on behalf of any Texas voter members." *Id.* The plaintiffs lacked standing, the court reasoned, because "[t]hey did not allege that identification of voter names and identification numbers [would] directly lead to action relevant to the NVRA or any other statute, nor that their direct participation in the electoral process [would] be hindered. At best, they might at some future date seek to vindicate the specific interests of third party voters whom they (and their counsel) do not represent—which is both speculative and a far cry from concrete injury to [the p]laintiffs themselves." *Id.* at 938–39.

Other courts have similarly reasoned that "[a] general desire to audit a state's NVRA records without concrete plans to act upon information contained in the records in a manner

consistent with the purpose of the statute does not establish standing." *See Pub. Interest Legal Found. v. Sec'y Commonwealth of Pa.*, 136 F.4th 456, 469 (3d Cir. 2025). The Third Circuit, for example, found no NVRA standing based on the plaintiff's allegations of: (1) an inability to "study and analyze" Pennsylvania's "voter list maintenance activities," thereby "hamper[ing]" its election integrity and compliance activities; (2) frustration of its production and dissemination of educational materials; and (3) the expense of time and money. *Id.* The court reasoned that the plaintiff's objectives did not advance the purposes of the NVRA and that the plaintiff had "offer[ed] no explanation of how its inability to study and analyze and scrutinize the requested records ha[d] hindered its own participation in the electoral system or the expansion of voter participation in federal elections." *Id.* at 467–68. On the third point, the court reasoned that the plaintiff could not manufacture standing by spending time and money to vindicate a right. *Id.* at 469. The Sixth Circuit found that the same plaintiff lacked standing to sue for records of deceased voters based on a lack of downstream consequences to its ability to perform research, educational, and remedial activities and accumulate "institutional knowledge" to carry out its core functions, describing the allegations as "at most, a vague and unspecific injury." *Pub. Interest Legal Found. v. Benson*, 136 F.4th 613, 617, 631 (6th Cir. 2025); *see also Republican Nat'l Comm. v. Caldwell,* No. 25-17612, 2026 WL 2085991, at *1, *8 (D.N.J. July 20, 2026) (rejecting allegation that "without the records, Plaintiff . . . cannot engage in voter communications, get-out-the-vote activities, and other political action" as "too vague to establish the requisite nexus").

Here, Plaintiffs have presented a closer question. On one hand, the timing of Plaintiffs' request—in the days before a midterm election—suggests that their interests are more particularized than the general audit contemplated in *Campaign Legal Center*. On the other hand, the scope of their request—seeking all transactions for a two-year period—does not appear to be

tailored to the backlog that purportedly gave rise to Plaintiffs' NVRA request. Plaintiffs assert that "[t]he specific information withheld . . . is needed to determine whether the reported breakdown has continuing consequences and where, if anywhere, organizations must concentrate their existing efforts." *See* ECF No. 2 at 7–8. They insist that failure to produce the requested records will impair their "ongoing voter registration, voter-assistance, get-out-the-vote ["GOTV"], and election-protection activities and their ability to deploy resources based on accurate information about the affected transactions."

But it is not clear to the Court how the requested data would actually inform Plaintiffs' efforts in the upcoming election. The deadline for voter registration, for example, has closed. And, as for voter assistance and protection and GOTV efforts, it is not clear what specific advice Plaintiffs could provide based on the pseudonymized records beyond informing voters that they can cast a provisional ballot. Plaintiffs do not identify any members or counties that were allegedly affected by either the first or second backlog or how Plaintiffs might use the requested records to serve the purposes of the NRVA.[1] Rather, much like the request at issue in *Campaign Legal Center*, it appears that Plaintiffs "might at some future date seek to vindicate the specific interests of third party voters whom they (and their counsel) do not represent—which is both speculative and a far cry from concrete injury to Plaintiffs themselves." 49 F.4th at 938–39. In short, Plaintiffs' allegations of downstream consequences amount to a "lack of opportunity" to evaluate the State's remediation and target outreach efforts analogous to the injury rejected as "speculative rather than concrete" in *Campaign Legal Center*. *See id.* at 937.

[1] To the extent that Plaintiffs intended to invoke associational standing by alleging that their members were among the 500,000 DPS transactions that Defendants did not timely transmit to county election officials, they must specifically identify at least one member suffering harm. *See Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 497 (5th Cir. 2024) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)). They have not done so here.

The Court will grant Plaintiffs an opportunity to amend their pleadings to identify a particularized injury. *Cf. Campaign Legal Ctr.*, 49 F.4th 931, 940 (5th Cir. 2022) (Ho, J. concurring) (noting that "[t]here may be any number of ways" for plaintiffs to show downstream consequences, including where the information "is necessary to engage in public advocacy about a pressing matter of policy" or "is essential to furthering Plaintiffs' mission to protect the voting rights of various communities"); *see also Pub. Interest Legal Found. Inc. v. Fontes*, 816 F. Supp. 3d 984, 990, 991 (D. Ariz. 2026) (recognizing "several downstream injuries" that were concrete and particular where the plaintiff "identifie[d] specific categories of reports it prepares," the "denial of the records prevent[ed] it from providing policy advice and testimony to state officials and Congress," and the plaintiff could not "complete the work it intended to do"). But as stated above, any amended complaint that alleges proper standing to vindicate the purposes of the NVRA may still not be enough to warrant the emergency and declaratory relief sought before this next election.

Accordingly, Plaintiffs' complaint is **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction, and their motions for relief (ECF Nos. 2–4) are **DENIED AS MOOT**.

It is so **ORDERED**.

**SIGNED** this October 29, 2026.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE